Filed 12/16/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G065108 |
| v. | (Super. Ct. No. 23CF1518) |
| MELCHOR ROQUIN CABALAR, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Terri K. Flynn-Peister and Kevin Haskins, Judges. Reversed and remanded with directions. Motion to strike and refile corrected brief, denied. Request for judicial notice, denied.

Markelz Law Group and Christopher Markelz for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General,

Stephanie H. Chow and Sahar Karimi, Deputy Attorneys General, for Plaintiff and Respondent.

*  *  *

In enacting Penal Code section 1001.36 to create a mental health diversion program, and thereafter amending the statute to refine its details, the Legislature has put in place a pretrial means of getting individuals mental health treatment and resources that meet their needs in order to reduce recidivism and advance public safety.[1] Defendant Melchor Roquin Cabalar appeals from a judgment entered after the trial court denied his motion for mental health diversion. Although the court found he met all statutory eligibility and suitability criteria, it exercised "residual discretion" to deny the motion based on public safety concerns and a perceived inability of courts to monitor individuals during the period of diversion.

On appeal, Cabalar argues the trial court had no authority to deny diversion once it concluded he met the statutorily specified eligibility and suitability criteria. He further contends the court abused its discretion by relying on matters inconsistent with the purposes of the mental health diversion statute and an incorrect statement about court oversight during diversion. Although we conclude a grant of diversion is discretionary even if a defendant meets all eligibility and suitability criteria specified in the statute, we reaffirm what other appellate courts have made clear: a court's discretion must be exercised in a manner consistent with the principles and purposes of the legislation, which includes having mental health diversion apply as broadly as possible. Because the court in this case based its denial of

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

diversion on findings unsupported by substantial evidence, matters inconsistent with legislative policy and purpose, and a misunderstanding of a characteristic of the diversion program, we conclude the denial of diversion was an abuse of discretion. Accordingly, we reverse the judgment and remand the matter with directions that, absent any evidence of changed circumstances since the original denial that affect Cabalar's eligibility or suitability for diversion, the court grant his diversion motion.

FACTS

At a time when Cabalar was on formal probation in three other counties, a complaint filed in Orange County Superior Court charged him with seven counts based on a May 2023 arrest: possession of a firearm by a felon (Pen. Code, § 29800, subd. (a)(1)), possession of ammunition by a prohibited person (*id.*, § 30305, subd. (a)(1)), possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a)), obliterating firearm identification (Pen. Code, § 23900), two counts of misdemeanor possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)), and misdemeanor possession of controlled substance paraphernalia (*id.*, § 11364, subd. (a)).

I.

DEFENDANT'S MENTAL HEALTH DIVERSION MOTION

After being arraigned on the complaint, entering a not guilty plea, and being released on bail, Cabalar filed a motion for mental health diversion pursuant to section 1001.36. His moving papers argued he suffered from various mental disorders that substantially contributed to commission of the crimes charged and he met all the qualification requirements for pretrial diversion under the statute. He explained a licensed psychologist, Dr.

Dean Leav, evaluated and diagnosed him, and he thereafter sought treatment on his own, which included medication and therapy.

Submitted in support of the motion was an initial report and a supplemental report by Dr. Leav, as well as records from a mental health clinic. Dr. Leav's initial report, dated June 29, 2023, conveyed "there [was] substantial evidence to conclude that . . . Cabalar suffers from" six mental disorders identified in the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5): major depressive disorder, generalized anxiety disorder with panic attacks, opioid use disorder, stimulant use disorder, cannabis use disorder, and alcohol use disorder.[2] It further explained that Cabalar, who was 24 at the time, started using cannabis and alcohol when he was in second grade, and he would often use drugs and alcohol "to self-medicate in response to the severe symptoms of anxiety and depression."

Dr. Leav opined Cabalar's mental disorders "played a significant role in the commission of the charged offenses." His report detailed that Cabalar "had been using drugs and/or alcohol every single day for about 2 months leading up to the . . . arrest. He had not been receiving treatment for his addiction. He was not able to manage the cravings. His judgment and decision-making were significantly impaired." Based on the circumstances, Dr. Leav believed he would not have committed the offenses had he been sober and psychiatrically stable.

---

[2] On our own motion, and consistent with the trial court's actions, we take judicial notice of excerpts from the DSM-5 concerning the mental disorders with which Cabalar was diagnosed. (Evid. Code, § 459, subd. (a).)

With respect to treatment, the report noted Cabalar knew he needed professional help, understood the potential risks of not being in treatment, and agreed to comply with the recommended treatment, which had medication, therapy, and other components. Further, Dr. Leav opined "Cabalar's symptoms motivating the criminal behavior would respond to mental health treatment" and he "would not pose an unreasonable risk of danger to public safety while out on diversion." The latter opinion was qualified by the following statement: "if he is able to stay compliant with treatment and abstain from further drug/alcohol usage."

Dr. Leav's supplemental report, dated September 8, 2023, confirmed the same mental disorders listed in the initial report and provided an update on Cabalar's status. He noted Cabalar had "been diligent in attaining the proper medications," had "been taking medications as prescribed," and self-reported feeling lessened symptoms. After saying he was "likely to relapse without ongoing therapy," Dr. Leav reported Cabalar was cooperative and motivated, had "been mostly consistent in his attendance" at weekly individual therapy sessions with him, and had attended four Alcoholics Anonymous meetings. Although he stated Cabalar had been "completely sober" since starting therapy with him three months prior, he also acknowledged Cabalar was "still working on incorporating [random drug and alcohol screening] as part of his treatment program."

The medical records provided to the court indicated Cabalar was evaluated on three separate dates over a one-month period in July and August 2023, given outpatient resources, and educated on medications, symptoms to monitor, and coping skills. Records from the first evaluation stated he "d[id] not present with any danger to self or others[, and] thus psychiatric symptoms can be managed on an outpatient basis with

5

medications." Those concerning the second evaluation stated "[h]e [was] responding well to medication," was "future oriented," and was "motivated to participate in care." And, the third evaluation records indicated he "demonstrated no acute behavior at [the] time and [was] able to return to the community."

## II.

## THE PEOPLE'S OPPOSITION

The People opposed Cabalar's motion on three bases: "(1) [his] mental disorders were not a significant factor in the commission of the charged offenses; (2) [he was] unlikely to comply with the requirements of treatment; and (3) [he] pose[d] an unreasonable risk of danger to public safely." To support these arguments, the People relied on the circumstances of Cabalar's arrest for the current offenses which were narrated in a police report, as well as Cabalar's prior criminal history detailed in a rap sheet and various police reports. The People did not offer any opinion evidence from a mental health professional or otherwise.

The May 2023 police report related to the current offenses indicated officers encountered Cabalar around midnight in a high crime area with a heavy gang population and recent increase in violent crime. He was sitting in the driver seat of a car parked along a curb in a "no stopping at any time" zone, with another male standing outside the passenger side of the car. Cabalar was wearing a balaclava mask that covered all of his face except his eyes. When he saw the police car, he "open[ed] his eyes extremely wide and fr[oze] for a brief moment" before "start[ing] to reach his hands into the center console of the vehicle." An officer approached him, and Cabalar denied having any weapons in the vehicle and denied being on active probation or parole. His hands shook and his voice trembled. In a search of the car, officers

6

found a methamphetamine pipe, Xanax pills, and a 0.40 caliber firearm with "one round in the chamber and ten live rounds of ammunition in the magazine which was inserted into [it]." The firearm's serial number had been scratched off. In Cabalar's pocket, they found methamphetamine. A records check revealed Cabalar was a convicted felon and on active probation.

The rap sheet listed a variety of arrests and convictions between 2021 and 2023 in different counties. Among the crimes were grand theft, burglary, and vandalism. Also included was a driving under the influence (DUI) arrest from October 2023, roughly a month and a half after Cabalar filed the mental health diversion motion then pending before the court.

Police reports related to a 2021 incident which led to Cabalar being put on formal probation for convictions of burglary, grand theft, and vandalism, detailed the circumstances leading to his arrest. Officers were dispatched to a mall department store on reports of a robbery in progress involving two individuals who stole from the store's jewelry counter and fled. Witnesses reported the suspects, one of whom was later identified as Cabalar, wore masks, one smashed a glass display case with a hammer, and both pulled jewelry out and ran from the store. Officers located and arrested Cabalar and the other suspect a short distance away. It was later determined the value of loss to the store was approximately $173,000. In a postarrest, post-*Miranda*[3] interview, Cabalar eventually admitted he and the other suspect worked as a team to steal jewelry on seven other occasions in the prior month from different locations of the same department store. He said he did it because he needed money to pay for a place to live.

---

[3] *Miranda v. Arizona* (1966) 384 U.S. 436.

## III.

## THE TRIAL COURT'S RULING

In January 2024, the trial court held a hearing concerning the mental health diversion motion and ultimately denied it. The court concluded Cabalar was eligible for diversion because he suffers from mental disorders listed in the DSM-5 and the People did not overcome the statutorily required presumption that one or more of the disorders was a significant factor in the commission of the charged offenses. It also found Cabalar satisfied all the statutory suitability criteria: a qualified mental health expert opined his symptoms would respond to treatment; he consented to diversion; he agreed to comply with treatment; and he did not pose an unreasonable risk of danger to public safety.

Regarding the risk to public safety, the court elaborated: "That's a difficult one for me because he is out on bond, and that is always something that I take into account as far as danger. [¶] I will be candid. I didn't put him out on bond. I didn't put him on as low of a bond as he has, and he has picked up a DUI during this whole time and the bond hasn't increased. I'm not here for a bail review, but those are all factors that concern this Court. [¶] I think the defendant is a danger. I don't necessarily think he's a danger of committing a super strike."

While recognizing defendant met the statutory eligibility and suitability criteria, and acknowledging Cabalar needs mental health treatment, the court said it was "not convinced [it] should divert [him]." Explaining that mental health diversion is the "least restrictive means of monitoring somebody," targeting those who show a pattern of going in and out of the criminal justice system because of a mental health issue, the court

8

noted there were no "ways of notifying the [c]ourts when relapses happen." It expressed it was "not satisfied that [Cabalar's] not going to harm somebody."

Among the circumstances on which the court ultimately based its decision to deny diversion, which it indicated was a discretionary one, were the following: (1) Cabalar's criminal history, which the court described as "escalating" and evidencing a pattern of "wanting to rob people, going and smashing and grabbing, [and] [n]ow he's doing it with guns"; (2) the circumstances of the current offenses, which the court stated included Cabalar "wearing a mask and [having] a loaded firearm" while "high on methamphetamine"; (3) Cabalar's "extremely severe alcohol and drug use," the latter of which the court noted "runs the gambit of all of them," and the possibility of relapse; and (4) Cabalar's arrest for a DUI while out on bond for the current offenses even though he was pursuing treatment.

## IV.

### THE JUDGMENT

In January 2025, Cabalar pled guilty to all counts except the obliterating firearm identification count which had already been dismissed by the People. The court sentenced him to two years of formal probation with a condition of probation being that he serve 364 days in jail.

Cabalar timely appealed.[4]

---

[4] Based on an unopposed request by Cabalar for a stay of execution, this court issued an order staying execution of his jail term sentence pending resolution of this appeal. The order indicated the stay would be immediately dissolved upon this court being notified that Cabalar violated his probation conditions or possessed or consumed alcohol. This court has not receive any such notice in the 10 months since that order was issued.

DISCUSSION

Cabalar contends the trial court abused its discretion in denying him mental health diversion even though it found he met all statutorily specified eligibility and suitability criteria. He contends the court had no choice but to grant diversion once it determined he was eligible and suitable, as defined by the Legislature. In addition, he argues the court abused its discretion by basing its denial on matters inconsistent with the purposes of the mental health diversion legislation and an incorrect statement of the law. We disagree with Cabalar's first contention, but conclude that, on the record before us, the trial court erred in denying diversion because it relied on factual findings unsupported by substantial evidence, bases inconsistent with the purposes and principles of the legislation, and an apparent misunderstanding of an aspect of the law.[5]

I.

THE MENTAL HEALTH DIVERSION STATUTES

Originally enacted in 2018, sections 1001.35 and 1001.36 provide for a pretrial diversion program for certain criminal defendants with mental disorders. (Stats. 2018, ch. 34, § 24.) In context, "'"[p]retrial diversion" means the postponement of prosecution, either temporarily or permanently, . . . to allow the defendant to undergo mental health treatment,' subject to certain

---

[5] The Attorney General's initial brief argued Cabalar forfeited his challenge to the denial of diversion by waiving his appellate rights as part of his plea agreement. After Cabalar's reply brief accurately pointed out that such an argument was factual incorrect, the Attorney General filed a motion requesting this court strike the original respondent's brief and replace it with a corrected brief which eliminated the forfeiture argument. We deny the motion and instead consider the Attorney General's actions as a concession that the forfeiture argument is without merit.

10

conditions." (*People v. Braden* (2023) 14 Cal.5th 791, 801.) Among the express purposes of the program is to "increase[] diversion of individuals with mental disorders to mitigate the individuals' entry and reentry into the criminal justice system while protecting public safety." (§ 1001.35, subd. (a).)

Under section 1001.36, with the exception of defendants charged with certain crimes, a trial court "may, in its discretion, and after considering the positions of the defense and prosecution, grant pretrial [mental health] diversion to a defendant . . . if the defendant satisfies the eligibility requirements for pretrial diversion set forth in subdivision (b) and the court determines that the defendant is suitable for that diversion under the factors set forth in subdivision (c)." (*Id.*, subd. (a).)

The two eligibility requirements are: (1) "[t]he defendant has been diagnosed with a mental disorder as identified in the most recent edition of the [DSM]"; and (2) "[t]he defendant's mental disorder was a significant factor in the commission of the charged offense." (§ 1001.36, subd. (b)(1)–(2).) Regarding the later, an amendment to the statute effective as of January 2023 requires the court to "find that the defendant's mental disorder was a significant factor in the commission of the offense unless there is clear and convincing evidence that it was not a motivating factor, causal factor, or contributing factor to the defendant's involvement in the alleged offense." (*Id.*, subd. (b)(2); see also Stats. 2022, ch. 735, § 1.)

"[A] defendant is suitable for pretrial diversion" if the following four criteria are met: (1) a qualified mental health expert opines the defendant's symptoms of the relevant mental disorder "would respond to mental health treatment"; (2) "[t]he defendant consents to diversion and waives [their] right to a speedy trial"; (3) "[t]he defendant agrees to comply with treatment as a condition of diversion"; and (4) "[t]he defendant will not

11

pose an unreasonable risk of danger to public safety, as defined in [s]ection 1170.18, if treated in the community." (§ 1001.36, subd. (c)(1)–(4).)

If the defendant meets all eligibility and suitability criteria, the trial court "may, in its discretion," grant pretrial diversion. (§ 1001.36, subd. (a).) "The maximum period of diversion [for a felony] is two years. [Citation.] If the defendant is subsequently charged with an additional crime, or otherwise performs unsatisfactorily in the assigned program, then the court may reinstate criminal proceedings. [Citation.] 'If the defendant has performed satisfactorily in diversion, at the end of the period of diversion, the court shall dismiss the defendant's criminal charges that were the subject of the criminal proceedings at the time of the initial diversion.'" (*People v. Frahs* (2020) 9 Cal.5th 618, 627 (*Frahs*).)

A trial court's mental health diversion determination is reviewed for an abuse of discretion. (*People v. Bunas* (2022) 79 Cal.App.5th 840, 848 (*Bunas*); *People v. Moine* (2021) 62 Cal.App.5th 440, 449.) "'A court abuses its discretion when it makes an arbitrary or capricious decision by applying the wrong legal standard [citations], or bases its decision on express or implied factual findings that are not supported by substantial evidence [citation].'" (*Bunas*, at pp. 848–849.)

## II.

### TRIAL COURT'S RESIDUAL DISCRETION TO DENY DIVERSION, GENERALLY

Over the years since the statute's original enactment, appellate courts have recognized section 1001.36 provides the trial court with discretion to deny diversion even if it finds a defendant meets the statutory eligibility and suitability criteria. (See., e.g., *People v. Vaughn* (2024) 105 Cal.App.5th 124, 134 (*Vaughn*); *Sarmiento v. Superior Court* (2024) 98 Cal.App.5th 882, 892 (*Sarmiento*); *People v. Gerson* (2022) 80 Cal.App.5th

12

1067, 1080.) Such discretion is commonly referred to as a court's "residual discretion." Cabalar argues any residual discretion that may have previously existed was eliminated by an amendment to the statute which took effect in January 2023. So his argument goes, a trial court may not deny diversion once it concludes a defendant is eligible and suitable, as defined by the statute. We are not persuaded.[6]

Aside from substantive changes to certain subdivisions not relevant here, the statutory amendments which took effect in the beginning of 2023 reorganized existing provisions and clarified the decision-making process. Whereas before that time there was a list of six statutory criteria for determining whether a defendant qualified for potential diversion (former § 1001.36, subd. (b)(1)–(6) (Stats.2018, ch. 34, § 24)), the amended statute divided the six criteria into two groups—two became eligibility criteria and four became suitability criteria. (§ 1001.36, subds. (b)–(c); *Frahs, supra*, 9 Cal.5th at pp. 626–627.) The amended statute also clarified that if a court finds a defendant meets the eligibility criteria, it "must" then consider whether they meet the suitability criteria. (§ 1001.36, subd. (c).)

Notably, the 2023 amendments did not change permissive language in the very provision of the statute which empowers the trial court to grant pretrial mental health diversion in the first instance. Both before and after the amendments, the statute says a court "may" grant diversion to

---

[6] Cabalar requests we take judicial notice of the Orange County Superior Court's procedural guidelines for mental health diversion. We deny the request, as the guidelines are not relevant to the issue of statutory interpretation raised by his argument. (See *State Comp. Ins. Fund v. ReadyLink Healthcare, Inc.* (2020) 50 Cal.App.5th 422, 442 [only relevant material is subject to judicial notice].)

a defendant who meets the specified statutory criteria. (§ 1001.36, subd. (a); Stats.2022, ch. 47, § 38 [version in effect prior to 2023 amendments]; Stats.2018, ch. 34, § 24 [original enactment]; see also *People v. Standish* (2006) 38 Cal.4th 858, 869 ["'presumption [is] that the word "shall" in a statute is ordinarily deemed mandatory and "may" permissive'"]; *In re Richard E.* (1978) 21 Cal.3d 349, 354 ["The ordinary import of 'may' is a grant of discretion"].) If anything, the 2023 amendments underscored that diversion is not mandatory by adding an express reference to the court's discretion that did not previously exist: "On an accusatory pleading alleging the commission of a [qualifying offense], the court may, *in its discretion, . . .* grant pretrial diversion . . . ." (§ 1001.36, subd. (a), italics added.)

       While we disagree with Cabalar's urged interpretation of the statutory language, it bears emphasizing a trial court's discretion is not unlimited or unconstrained. Indeed, residual discretion "must be exercised "'consistent with the principles and purpose of the governing law.'"" (*Vaughn, supra*, 105 Cal.App.5th at p. 135; see also *Gomez v. Superior Court* (2025) 113 Cal.App.5th 671, 691 (*Gomez*); *Sarmiento, supra*, 98 Cal.App.5th at p. 892; *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 ["'[A]ll exercises of legal discretion must be grounded in reasoned judgment and guided by legal principles and policies appropriate to the particular matter at issue'"].) "The stated purpose of mental health diversion "'is to keep people with mental disorders from entering and reentering the criminal justice system while protecting public safety, to give counties discretion in developing and implementing diversion across a continuum of care settings, and to provide mental health rehabilitative services.'"" (*Gomez*, at p. 691.) And, legislative history confirms there is "a strong legislative preference for treatment of mental health disorders because of the benefits of such treatment to both the

14

offending individual and the community." (*Sarmiento,* at pp. 892–893; see, e.g., Assem. Com. on Pub. Saf., analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended June 23, 2022 [explaining statutory amendments would "ensure that more Californians receive mental health support and resources they need by safely increasing the use of mental health diversion in appropriate cases" which was needed because research showed diversion was "substantially underutilized"].) Hence, our high court's agreement that the Legislature intends diversion "'to apply as broadly as possible.'" (*Frahs, supra,* 9 Cal.5th at pp. 630–631.)

With these legislative principles and policies in mind, we turn to the remainder of Cabalar's arguments.

## III.

### TRIAL COURT'S EXERCISE OF RESIDUAL DISCRETION IN THIS CASE

Cabalar contends the trial court abused its discretion by denying diversion based on public safety concerns outside the express scope of the statutory scheme and for reasons inconsistent with the statute's purpose and legislative intent. For reasons we explain, we agree the trial court erred.

In considering the last of the four statutory suitability criteria, the trial court found Cabalar would not pose an unreasonable risk of danger to public safety if treated in the community. (See § 1001.36, subd. (c)(4).) Stated differently, the court concluded there was no unreasonable risk he would commit one of the "super strike" violent felonies set forth in section 667, subdivision (e)(2)(C)(iv). (See § 1001.36, subd. (c)(4) [incorporating "unreasonable risk to public safety" definition from § 1170.18].)

Notwithstanding that finding, and findings that Cabalar met all other statutory eligibility and suitability criteria, the trial court said it was hesitant to trust he would not harm someone if granted diversion and

15

expressed its belief he was "a danger to the public." In explaining its reasoning, the court offered three supporting bases: (1) Cabalar's criminal history; (2) the circumstances of the current offenses; and (3) Cabalar's "alcohol and drug use." However, the court's findings and comments regarding, and reliance on, each of these bases were problematic under the circumstances.

## A. Criminal History

Regarding Cabalar's criminal history, the trial court characterized it as "escalating" and evidencing "a young man making very poor decisions and wanting to rob people." It further stated "[t]here's a pattern of [Cabalar] wanting to rob people, going and smashing and grabbing. Now he's doing it with guns." But, no evidence supports the court's statements about robbery and using firearms.

Although a rap sheet submitted to the court showed Cabalar was previously convicted of vandalism and burglary, as well as a few counts of grand theft, concurrently filed police reports showed they all related to a series of unarmed jewelry thefts from department stores over the course of a roughly three-week period in 2021. Consistent with the lack of a robbery conviction, the reports did not evidence that force or fear was used, and there was no other indication of harming or attempted harm anyone. To the contrary, they indicated Cabalar told police he "'[d]efinitely [didn't] want to hurt anyone" and he stole from the stores because he needed money for a place to stay after being kicked out of where he had been living.

## B. Circumstances of the Current Offenses

As for the current offenses, the court recognized there was no robbery. It also seemed to acknowledge there was no indication of what Cabalar intended to do with the loaded firearm found in his vehicle.

16

Nevertheless, the court expressed skepticism of his intentions: "I'm not sure what the purpose of wearing a mask covering, high on methamphetamine, and having a loaded firearm is other than you potentially want to hurt somebody or intimidate somebody." Such speculation cannot be used to justify a finding of danger. (*People v. Grant* (2020) 57 Cal.App.5th 323, 330 (*Grant*) [speculation, surmise, or conjecture does not amount to substantial evidence to support a factual finding].) And under the circumstances, it proves even more problematic because the only evidence in the record concerning the reasons for Cabalar's actions suggests he was not out to hurt or intimidate someone. Specifically, Dr. Leav's report conveyed Cabalar had been using methamphetamine, marijuana, alcohol, and Xanax earlier in the day, and he was still under the influence when arrested. He explained that because Cabalar "often becomes paranoid and very fearful when . . . using drugs," feeling "'something's going to happen' to him," "[h]e often wears a face mask" to avoid being seen in public and "had been carrying a gun in his backpack, which he kept in his car."

*C. Cabalar's Alcohol and Substance Use*

Turning to Cabalar's drug and alcohol use, the trial court characterized it as "extremely severe" and stated it was "one of the biggest factors" causing it concern about whether he could comply with the diversion program. It also noted Cabalar was arrested for a DUI while out on bail in the current case. But nothing in the record indicates Cabalar was previously treated for five of the six mental disorders with which Dr. Leav diagnosed him, meaning nothing indicates he had a history of not complying with a treatment plan. To the contrary, for the one disorder for which he did receive prior treatment, which involved fentanyl addiction, Dr. Leav's report stated Cabalar had not used fentanyl in nearly four years. And regarding the DUI

17

arrest, the court was not presented with information on the circumstances of it, and, as the court rightly acknowledged, it was still an open case. Under these circumstances, the court's reliance on the fact of the arrest was unwarranted, and the trial court's concern Cabalar might relapse was speculation which contradicted evidence before it. (See *Grant, supra*, 57 Cal.App.5th at p. 330 ["a finding of fact must be an inference drawn from evidence rather than a mere speculation as to probabilities without evidence"].)

As for the court's assertion that "addicts relapse," this more generalized assertion cannot, without more, be used to deny a person mental health diversion when one of the diagnoses rendering them eligible for diversion is an alcohol or other substance related disorder. Allowing otherwise would condone basing a denial on one of the consequences of their mental health disorder. Indeed, for each of the substance related disorders with which Cabalar was diagnosed, the DSM-5 identifies relapse as a consequence of withdrawal and other symptoms experienced during recovery. Further, it would preclude someone diagnosed with such a disorder from getting the treatment they need to stay out of the criminal justice system, a result inconsistent with the diversion statute's intended broad application and the Legislature's goal of having "more Californians receive [the] mental health support and resources they need." (Assem. Com. on Pub. Saf., analysis of Sen. Bill No. 1223 (2021–2022 Reg. Sess.) as amended June 23, 2022; see also *Frahs, supra*, 9 Cal.5th at pp. 630–631; *Sarmiento, supra*, 98 Cal.App.5th at pp. 892–893.)

This highlights another problematic aspect of the court's explanation: its focus on the fact that Dr. Leav's opinion concerning a lack of unreasonable risk of danger to public safety was conditioned on Cabalar

complying with his treatment plan, including staying sober. Part of what makes a person eligible for diversion under section 1001.36 in the first instance is a diagnosed mental health disorder and a mental health professional's opinion that such disorder was a significant factor in the commission of the charged offense. (§ 1001.36, subd. (b).) Because a treatment plan will necessarily be geared toward alleviating symptoms of the disorder, a mental health professional's opinions concerning treatment effectiveness and public safety danger will almost inevitably be conditioned on treatment compliance. For an alcohol or other substance related disorder, that will include maintaining sobriety. Thus, if diversion may be denied because a professional conditions their opinion on treatment compliance, it opens the possibility that entire categories of persons who otherwise meet all eligibility and suitability criteria, including expressing a willingness to comply with the recommended treatment, will be denied diversion even without any evidence of prior noncompliance. Such a result runs counter to the "strong legislative preference for treatment of mental health disorders." (*Sarmiento, supra*, 98 Cal.App.5th at pp. 892–893.) And it is of particular concern in cases like the present, where the only evidence of past treatment showed compliance with a treatment plan.

*D. Public Safety Concerns*

The parties disagree about whether a trial court may exercise its residual discretion to deny diversion based on public safety concerns other than an unreasonable risk of committing a super-strike. (See *Gomez, supra*, 113 Cal.App.5th at p. 690 [court cannot invoke residual discretion to create lower standard for finding that facts and circumstances of current offense indicate diversion would not protect public safety]; *Sarmiento, supra*, 98 Cal.App.5th at p. 896 ["In the guise of exercising its 'residual' discretion, a

court is not permitted to redefine public safety in a manner inconsistent with the Legislature's expressed intent"].) Because our focus is on the case before us, and because the record shows the bases for the court's danger finding were either unsupported or contradicted by the only evidence before it, and/or inconsistent with the legislation's purposes, we do not reach the issue. As is often the situation with new areas of legislation, caselaw in the mental health diversion arena is growing and evolving. However, reviewing courts have consistently made clear that the legislation's aim is for diversion to apply as broadly as possible so as to increase the provision of mental health treatment for the betterment of individuals and society as a whole. (See, e.g., *Frahs, supra*, 9 Cal.5th at pp. 630–631; *Sarmiento,* at pp. 892–893; *People v. Whitmill* (2022) 86 Cal.App.5th 1138, 1149; *People v. Williams* (2021) 63 Cal.App.5th 990, 1004–1005 (*Williams*).)

*E. Monitoring During Diversion*

Cabalar's lastly argues the trial court further abused its discretion by partially basing its decision on an incorrect assertion about the mental health diversion program. He focuses on the following statement made by the court: "The problem is the mental health diversion statute is our least restrictive means of monitoring somebody. We don't have any formal probation. We don't have ways of notifying the Courts when relapses happen." We agree the comment about an absence of means for notifying a court of a relapse is inaccurate. A person granted mental health diversion will be undergoing inpatient or outpatient treatment (§ 1001.36, subd. (f)(1)), and the statute requires "[t]he provider of the mental health treatment program in which the defendant [is] placed [to] provide regular reports to the court, the defense, and the prosecutor on the defendant's progress in

20

treatment" (*id.*, subd. (f)(1)(B)).[7] In addition, if the person "is performing unsatisfactorily in the assigned program," or is charged with an additional offense or is engaging in criminal conduct during diversion, the court must hold a hearing to determine whether to, inter alia, modify treatment or reinstate criminal proceedings. (*Id.*, subd. (g).) Thus, to the extent the court in this case relied on a lack of ability to monitor a person's activity and progress while participating in diversion as a basis for denial of Cabalar's motion, it did so in reliance on an incorrect statement of the law.

*F. Conclusion*

In sum, the court abused its discretion in denying mental health diversion based on findings unsupported by substantial evidence, grounds inconsistent with the principles and purposes of the legislation, and a misstatement of law. (See *Bunas, supra*, 79 Cal.App.5th at pp. 848–849.) As another appellate court has emphasized about mental health diversion, "trial courts must give serious consideration to this critical alternative, for the good not just of mentally ill offenders but, ultimately, society at large." (*Williams, supra*, 63 Cal.App.5th at p. 1005.) And in that vein, "denial of mental health diversion using [a court's] residual discretion should be limited to those situations where the purposes of the statute would not be achieved." (*Vaughn, supra*, 105 Cal.App.5th at p. 138, fn. omitted.)

---

[7] The statutory scheme leaves it to the trial court to use its discretion to establish, with input from the parties, the particularities of the regular reporting, which may include, for example, the required frequency, the necessary level of detail, and/or circumstances triggering a need for immediate notice to the court.

21

## DISPOSITION

The judgment is reversed. On remand the trial court shall vacate its order denying Cabalar's motion for pretrial mental health diversion and, absent any evidence of changed circumstances since the original denial that affect his eligibility or suitability for such diversion under the statutory criteria, issue a new order granting the motion. The stay of execution issued by this court on February 20, 2025, and extended on March 21, 2025, shall dissolve upon issuance of remittitur in this case.

DELANEY, ACTING P. J.

WE CONCUR:

GOODING, J.

SCOTT, J.